**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Z.J., a Minor, and L. C-W., Individually and as Guardian and Next Friend of Z.J., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 17-cv-5744 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, DISTRICT NO. 299, and ILLINOIS STATE BOARD OF EDUCATION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Z.J., a minor, and L. C-W., in her own capacity and as parent and next friend of Z.J. (collectively, "Plaintiffs"), bring this action against the Board of Education of the City of Chicago, District No. 299 ("CPS") and the Illinois State Board of Education ("ISBE") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 *et. seq.* ("IDEA") to appeal a portion of a decision and order issued by an independent hearing officer after a due process hearing. This matter is before the Court on Plaintiffs' motion for summary judgment [34]. For the reasons explained below, the Court grants Plaintiff's motion [34]. The Court finds that (1) CPS violated IDEA's "Child Find" obligation from March 2015 until April 2017 by failing to evaluate whether Z.J. may be eligible for special education and related services; (2) Z.J. may be entitled to compensatory services designed to provide her with the educational benefits that likely would have accrued from special education services that CPS should have provided, but this issue should be addressed in the first instance by an ISBE hearing officer on remand; and (3) Z.J. is entitled to an award of weekly vision therapy for 36 weeks, as recommended by Plaintiffs' experts,

and reimbursement for the costs of Dr. Kim's developmental vision assessment in the amount of $575.00.  L. C-W. shall provide CPS with a copy of the itemized bill and proof of payment or, if Dr. Kim has not been paid, a copy of the itemized bill and statement from L. C-W. that the payment should be made directly to Dr. Kim.  CPS shall provide reimbursement/payment within 30 days of receipt of the itemized bill.  This matter is remanded to an ISBE hearing officer to determine whether Z.J. is entitled to an award of compensatory services and, if so, what services are sufficient to provide Z.J. with the educational benefits that likely would have accrued from special education services that CPS should have provided.  Plaintiffs' request for an award of reasonable attorneys' fees and costs remains pending.  This case is set for status hearing on October 18, 2018 at 9:00 a.m.

## I.    Background

The Court takes the relevant facts from the parties' Local Rule 56.1 statements and exhibits thereto, [35], [39], and [41], the administrative record, [14-1] through [14-5], and the affidavit and supplemental report of Dr. Shelley Kim, which are attached to Plaintiffs' unopposed motion to supplement the administrative record, [18-1].  The following facts are undisputed except where a dispute is noted.

This Court has jurisdiction pursuant to 20 U.S.C. 1415(i)(3) and 105 ILCS 5/14-8.02. Venue is proper in this Court.  Plaintiff Z.J. brings this action by and through her mother, Plaintiff L. C-W., as guardian and next friend.  L. C-W. also brings this action on her own behalf.  Plaintiffs reside in Chicago, Illinois, within the boundaries of School District No. 299.  At the time the due process hearing that is the subject of this lawsuit was initiated, Z.J. was twelve years and eleven months old and attending 7th Grade at Kwame Nkrumba Academy ("KNA"), a Charter School operated under the auspices of the Chicago Public Schools ("CPS"). CPS is a body politic and

corporate organized to maintain a system of free schools commonly known as the Chicago Public Schools District No. 299.  CPS may sue and be sued under the name of Board of Education of the City of Chicago.  The ISBE is the state education agency charged with responsibility for compliance with requirements of the IDEA throughout Illinois.  ISBE was responsible for producing the record of the hearing under appeal in this case.

From preschool through 4th grade, Z.J. was enrolled as a student in private schools in Chicago.  In 5th grade, Z.J. transferred to Higgins Elementary ("Higgins"), a CPS school.  Z.J. transferred to KNA in 6th grade (the 2015-16 school year) due to concerns about staff turnover, class size, and bullying at Higgins.  Z.J. attended KNA in 6th grade and 7th grade (the 2016-17 school year).

CPS uses the Northwest Association Measures of Academic Progress ("NWEA"), along with classroom grades and attendance, to evaluate its students' performance and eligibility for promotion at the end of the school year.  The NWEA is typically administered in October, February and June each year.  According to CPS, the two main indicia of a student's success and progress are NWEA scores and classroom grades.

The administrative record includes the following NWEA test scores for Z.J.:

- Higgins, 2014-2015 school year
  - October 2014: 12th percentile in math
  - February 2015: 15th percentile in math
  - June 2015: 14th percentile in math

- KNA, 2015-2016 school year
  - October 2015: 8th percentile in math
  - February 2016: 17th percentile in math
  - June 2016: 6th percentile in math

- KNA, 2016-2017 school year
  - October 2016: 7th percentile in math
  - Winter 2017: 10th percentile in math

During the fall and early winter of the 2015-16 school year, L. C-W. became concerned about Z.J.'s grades and processing delays. On January 12, 2016, L. C-W. sent a letter to Z.J.'s teacher and to KNA's principal requesting that Z.J. be evaluated. By the end of the 2015-2016 school year—June 21, 2016—Z.J. had not yet been tested. On the last day of school, Parent received a letter stating that Z.J. would be required to repeat sixth grade if she did not attend a summer program and obtain a passing grade in math.

Shortly before the end of the school year, on June 17, 2016, L. C-W. filed a request for a due process hearing and complained that no testing had been done in response to her January 12 letter. The ISBE appointed Mary Jo Strusz as independent hearing officer ("IHO") to conduct a due process hearing. The IHO granted L. C-W.'s motion for a "stay put" order under the IDEA, which required that Z.J. be promoted to 7th grade during the 2016-2017 school year. The due process hearing was delayed pending completion of evaluations related to Z.J.'s eligibility for special education services.

CPS conducted an initial evaluation on July 29, 2016. The evaluation included the following: 1) a psychological evaluation by a CPS psychologist; 2) a social work assessment by a CPS social worker; 3) an occupational therapy assessment by a CPS occupational therapist; and 4) a speech evaluation by a CPS speech/language pathologist. On September 19, 2016, Z.J. underwent a central auditory processing evaluation by a CPS audiologist. On October 5, 2016—while she was in 7th grade at KNA—Z.J. was determined to be eligible to receive special education services. The basis of eligibility was a specific learning disability.

CPS convened an Individualized Education Program ("IEP") meeting on October 12, 2016, at which it was determined that Z.J. was eligible for the following: consultative services between Z.J.'s teacher and a special education teacher regarding math and language arts for 20 minutes per

week; direct speech language services from a speech/language pathologist; and certain modifications and accommodations. L. C-W. had concerns about the adequacy of CPS's evaluations and therefore requested independent educational evaluations ("IEEs") at CPS's expense.

CPS requested a due process hearing to obtain a ruling that its evaluation was comprehensive and appropriate as required by the IDEA and that Plaintiffs' request for IEEs at CPS's expense should be denied. ISBE again appointed Mary Jo Strusz as the IHO and consolidated the case with Plaintiffs' due process case.

Prior to the due process hearing, L. C-W. arranged for several private evaluations by medical professionals. These included a comprehensive speech/language evaluation and an assistive technology assessment by Dr. Janet Marsden-Johnson, Ph.D., a neuropsychological evaluation by Dr. Jacqueline Rea, Ph. D, and an occupational therapy evaluation by Mary Block, M.S. O.T.R./L. Block halted her testing because of concerns about Z.J.'s vision and recommended a comprehensive vision assessment. L. C-W. therefore arranged for a vision exam with Dr. Shelley S. Kim, F.C.O.V.D., a behavioral optometrist. A written report from Dr. Kim's initial exam noted diagnoses of bilateral myopia and a binocular vision disorder. Dr. Kim recommended a full evaluation for visual efficiency skills and minimum 9 months of weekly vision therapy sessions. Dr. Kim's full evaluation of visual efficiency skills was delayed because of AN inadvertent misunderstanding by Dr. Kim's staff that postponed scheduling the follow up evaluation. Dr. Kim's report on the visual efficiency assessment—which was issued on March 21, 2017 and not available at the due process hearing—made diagnoses of accommodative infacility, convergence insufficiency and oculomotor dysfunction. Dr. Kim recommended a course of vision therapy to remediate these conditions and help Z.J. develop the necessary visual abilities for academic

achievement. The cost of the recommended 36 weeks of vision therapy is $5,765.00 and the cost of the vision assessment is $575.00. The recommended vision therapy program would emphasize the following:

> - Monocular activities designed to equalize the focusing, tracking and pointing of each eye.
> - Binocular work to improve eye-teaming efficiency.
> - Visual-spatial tasks to develop integrated sequential and directional concepts.
> - Form training stressing: visual discrimination, spatial relationships, form constancy, figure-ground relationships and visual closure.
> - A visualization program to improve the speed and span of visual recognition as they pertain to short and long-term visual memory.
> - Inter-sensory integration skills through visual-auditory-verbal matching.
> - Activities to integrate reflexive movement patterns to better facilitate the development of visual abilities.

[39] at 13-14. Mary Block's report also recommended vision therapy and stated that Z.J. would benefit educationally by receiving vision therapy services to address her vision deficits.

The IHO conducted a due process hearing over six days—March 23, 24, 27, 28 and 29 and April 3, 2017. Plaintiffs called eight witnesses and CPS called ten witnesses. CPS submitted a witness list for the hearing that included the case manager for Higgins Elementary School, but did not call that person or any other witness from Higgins.

As is relevant here, Plaintiffs' witnesses Dr. Kim, Block, and Dr. Rea all recommended interventions to address Z.J.'s visual processing difficulties. Dr. Kim testified that while Z.J.'s "eyes are healthy and each eye individually works fine, [Z.J.] is dysfunctional when both eyes attempt to work together." [22-1] at 53. According to Dr. Kim, Z.J. "has depth perception and ocular movement issues, specifically the eyes do not track smoothly, which causes skipping of letters or numbers, which may affect [her] reading and mathematics, and ability to complete standardized testing." *Id*. Dr. Rea testified that "the vision and ocular motor difficulties that were identified by Dr. Kim, especially with regard to ocular motor kind of tracking, are going to

exacerbate [Z.J.'s] reading issues." [39] at 14. According to Dr. Rea, "given how many visual processing difficulties were identified upon Dr. Kim's evaluation, [Z.J. is] likely to respond less efficiently to her reading interventions, if the visual processing issues aren't also addressed." *Id.*

Three of Plaintiffs' experts also recommended compensatory education services. In particular Dr. Rea recommended 200 hours of 1:1 tutoring; Dr. Marsden-Johnson recommended that Z.J. receive, outside the regular school day, weekly one-hour sessions of speech/language therapy for one calendar year and weekly one-hour sessions with the "Fast Forward program" for a full calendar year; and Block recommended 104 hours of occupational therapy outside the regular school day.

The IHO issued her Final Determination and Order ("Final Order") on April 12, 2017. See [22-1]. The Final Order resolves seven issues raised by L. C-W. and one issue raised by the Board. On CPS's single issue—whether its evaluation of Z.J. on October 5, 2016 was comprehensive and appropriate for IDEA—the IHO ruled for Plaintiffs and found that the psychological, speech/language and occupational therapy evaluations completed by CPS were flawed and that CPS should have but did not complete an assistive technology evaluation. The IHO ruled for Plaintiffs on six of the seven issues that they raised: (1) whether CPS failed to provide a complete copy of all Z.J.'s records in a timely manner per IDEA, thus denying Z.J. a free appropriate public education ("FAPE"); (2) whether CPS failed to provide an appropriate, comprehensive and individualized evaluation in a timely manner in order to adequately identify the nature and extent of ZJ's disabilities; (3) whether CPS failed to develop an IEP after Parent's request of January 11, 2016, based on an appropriate evaluation, from March 2016 to the close of hearing; (4) whether CPS offered an appropriate placement with sufficient intensity and amount of special education services; (5) whether CPS failed to properly evaluate Z.J. on October 5, 2016 for all suspected

areas of disabilities in order for Z.J. to receive a FAPE; and (6) whether CPS failed to develop an appropriate IEP for Z.J. on October 12, 2016 through the close of hearing, including the appropriate type, intensity and amount of related services and develop appropriate and measurable goals.

The IHO found for CPS on one issue raised by Plaintiffs—namely, whether CPS violated its "Child Find" obligations, from June 18, 2014 to the present, by not maintaining an ongoing review of Z.J.'s performance and progress by teachers and professional personnel when student exhibited problems.  In denying Plaintiffs' claim that CPS violated "Child Find" obligations under IDEA, the IHO reasoned:

> The evidence presented did not include any of the Student's school records from Higgins. There were no standardized testing records from Higgins. There was no testimony regarding Student's education at Higgins. There is nothing in the record to indicate that Student showed any indications of problems that would have interfered with her educational progress prior to January, 2016. Parent did not provide any testimony that Student was moved from Higgins because she was not being academically successful. There was no evidence presented that KNA had the Student's Higgins' records or private school records. When the Parent registered Student, at KNA she had to fill out some forms, but did not provide Student's prior school records to KNA and thought KNA would obtain those records from Higgins, and KNA may have obtained them, however, no other evidence was presented regarding school records or where the Student stood academically in September of 2015 or prior.

> *** In this case, there is limited evidence that the Student's disabilities existed from birth.  However, there is also testimony that the disability may not have manifested itself until later in Student's educational career, when she failed to be able to access sufficient information to progress in school. The Student appeared to be doing well in math during her early school years, but has struggled with more advanced concepts. There is insufficient evidence to show that, prior to the sixth-grade, Student had a clear sign of a disability, and the District was not negligent in failing to test sooner.

> IDEA provides a statute of limitations for claims. The due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint.155 A parent or agency shall request an impartial due process hearing within two years the parent or agency knew or should

have known about the alleged action that forms the basis of the complaint.156 States may adopt a different timeline, however, Illinois has the two year timeline. The only exception to this rule is if the LEA made specific misrepresentation to the parent that it had resolved the problem forming the basis of the complaint or it withheld information from the parent that it was required to provide to the parent.

The uncontradicted testimony of Parent's witness Rea was:

When [Student] was in the third grade, there were concerns regarding the development of her reading comprehension skills. Per [Parent], [Student's] third grade teacher recommended that [Student] attend summer school that year. However, [Parent] reported that she elected to work with [Student] on her reading skills at home.

"[Parent] indicated that she became extremely concerned about [Student's] academic performance when she was in sixth grade, as [Student] was struggling significantly with mathematics."

There is limited testimony that Parent is a CPS psychologist. It was Parent's witness Rea who confirmed, during her testimony, that Parent was in "a related field". Although this testimony is not relevant to many of the issues presented at this hearing, it is relevant to determine if there is a Statute of limitations issue. Applying the "knew or should have known" standard to this issue, it is clear Parent was aware Student was experiencing difficulties in reading as early as third grade, but chose to provide her own interventions rather than call Student's issue to the attention of CPS. This is 3 years prior to the date of the filing of this Complaint.

After considering the Federal and State statutes, case law, witnesses testimony and other evidence, I find, by a preponderance of the evidence, that Parent knew or should have known that Student had a potential learning disability as soon as third grade, exercised self-help, and took no other action. By a preponderance of the evidence, I find there is no child find violation in this matter and Parents' claim fails.

[22-1] at 67-69.

The IHO ordered CPS to "prepare an IEP that includes specialized instruction and related services based on *** the independent evaluations reviewed in this due process hearing." [39] at 18. The IHO also ordered the following relief:

a. The District shall place Student in a therapeutic day school that provides special education and related services for students with a specific learning disability, and central auditory processing disorder. Within five days of receipt of this Order, the

District shall contact Acacia Academy and the Cove School to determine which school has an opening for Student. If more than one of these schools has an opening, Student shall be placed in the school that is closest to Student's home. The District shall complete all required paperwork to facilitate the placement in a timely manner and in no case more than one week after the paperwork is received.

b. Student shall be placed in the private therapeutic school for the remainder of this school year, and for school year 2017-2018. If it is determined at Student's IEP meeting that Student meets the requirements for ESY, the Student shall be placed in the private therapeutic school for the Summer of 2017 program.

c. The District and private therapeutic school shall hold an IEP meeting within one week of Student's enrollment and prepare an IEP that includes specialized instruction and related services based on the auditory processing evaluation presented by the District and the independent evaluations reviewed in this due process hearing.

d. The District shall provide transportation for Student to/from the therapeutic school on all of the therapeutic day school's days of student attendance. This includes any attendance for ESY school year.

e. The District shall provide Student with all assistive technology for the Student as recommended by the M-J evaluation.

f. The District shall reimburse the parents for the amounts they have paid for: Psychological assessment, $7000.00; OT assessment, $4937.50; Speech language and AT assessment $2,050.00. Parents shall provide the district a copy of the itemized bill and proof of payment in the form of a copy of a cancelled check to the evaluator, or if the evaluator has not been paid, a copy of the itemized bill and statement from Parent that the payment should be made directly to the evaluator. The District shall provide reimbursement/payment within 30 days of receipt of the itemized bill.

The Hearing Officer declined to order reimbursement for a developmental vision assessment and for vision therapy for Z.J. She also denied Plaintiffs' request for compensatory education services.

The IHO denied Plaintiffs' request for vision therapy on the ground that "[n]o additional evidence" apart from Dr. Kim's testimony "was presented that visual therapy is necessary to allow the Student to benefit from her education." [22-1] at 79. The IHO denied Plaintiffs' request for vision therapy for the further reason that "the professionals in this area are *** at odds about the benefits of visual therapy." *Id.* The IHO cited a web site in support of this conclusion:

10

http://www.allaboutvision.com/parents/visiontherapy.htm.  Apart from this citation in the Final

Order, the administrative record does not include any information from the website.

The IHO explained her denial of compensatory services as follows:

A) [Dr. Marsden-Johnson] specifies that Student should be compensated for lack of appropriate services provided during the past three years.  I have determined that the denial of FAPE did not begin until District failed to properly evaluate Student in response to the Parents' request of January 12, 2016.  As I cannot determine, with any certainty, whether the Fast ForWord program would be reasonably calculated to provide the educational benefits for Student, only for the denial of FAPE period. I decline this remedy request.

B) [Dr. Marsden-Johnson] has also determined, for denial during the same period, that Student is entitle to compensatory services in the form of remedial speech and language therapy for sixty (60) minutes once each week for one year. Again, I cannot determine, based on this recommendation alone, the compensatory education which would be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place. Therefore, I deny this remedy request.

C) Block has recommended 102 hours of occupational therapy services based on the lack of school based occupational therapy. There was no specific testimony as to how she arrived at this number and for what period of denial the compensatory service was calculated. I cannot determine, based on this recommendation alone, the compensatory education which would be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place. Therefore, I deny this remedy request.

D) Rea has recommended 200 hours of one-on-one compensatory instruction with a tutor or other professional who is s trained and certified to utilize systematic, sequential, empirically supported interventions. There was no specific testimony as to how she arrived at this number and for what period of denial the compensatory service was calculated. I cannot determine, based on this recommendation alone, the compensatory education which would be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place. Therefore, I deny this remedy request.

[22-1] at 80-81.

Plaintiffs filed a timely complaint challenging the IHO's determination of the time period

during which the Board was in violation of its Child Find obligation, denial of compensatory and

vision services, and denial of reimbursement for the costs of a developmental vision assessment. Plaintiffs also seek an award of reasonable attorneys' fees and costs for prosecuting their appeal.

On November 29, 2017, the Court entered an order [37] granting Plaintiffs' unopposed motion to supplement the record with a second report prepared by Dr. Kim, which diagnoses Z.J. with accommodative infacility, convergence insufficiency, and oculomotor dysfunction. Dr. Kim explains how these conditions affect Z.J.'s ability to learn and recommends a specific course of vision therapy.

Currently before the Court is Plaintiffs' motion for summary judgment.

## II.  Legal Standard

The IDEA requires every State educational agency, State agency, or local educational entity that receives federal funds to "provide a free appropriate public education—a FAPE, for short—to all eligible children." *Endrew F. v. Douglas County School Dist. RE-1*, 137 S. Ct. 988, 993 (U.S. 2017) (citing 20 U.S.C. § 1412(a)(1)). An agency covered by the IDEA "must provide a disabled child with *** special education and related services 'in conformity with the [child's] individualized education program,' or IEP." *Id*. at 994 (quoting 20 U.S.C. § 1401(9)(D)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id*. (quoting *Bd. of Ed. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).

The IDEA contains a "Child Find" mandate, which requires school districts to implement policies to identify, locate, and evaluate children "who are in need of special education and related services." 20 U.S.C. § 1412(a)(3)(A); see also *Demarcus L. v. Bd. of Educ. of the City of Chicago*, 2014 WL 948883, at *5 (N.D. Ill. Mar. 11, 2014). Procedures developed in Illinois to fulfill the State's Child Find obligations provide that "[e]ach school district shall be responsible for actively

seeking out and identifying all children from birth through age 21 within the district *** who may be eligible for special education and related services." 23 Ill. Adm. Code 226.100(a). This responsibility includes developing procedures for "[o]ngoing review of each child's performance and progress by teachers and other professional personnel, in order to refer those children who exhibit problems that interfere with their educational progress and/or their adjustment to the educational setting, suggesting that they may be eligible for special education and related services." 23 Ill. Adm. Code 226.100(a)(2). "The standard in establishing whether a school district has failed to identify a student with a disability under Child Find is that the school district overlooked 'clear signs of disability' and was 'negligent in failing to order testing,' or 'that there was no rational justification for not deciding to evaluate.'" *Demarcus L.*, 2014 WL 948883, at *5 (quoting *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)).

The IDEA requires that interested parties be given "[a]n opportunity *** to present a complaint *** with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A). Such complaints are adjudicated before a state administrative tribunal—here, an IHO—at an "impartial due process hearing." *Id*. § 1415(f)(1). Among other things, the IHO must address "[t]he failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement)." 34 CFR 300.151(b)(1). Compensatory educational services "should be 'reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'" *Petrina W. v. City of Chicago Public School Dist. 299*, 2009 WL 5066651, at *5 (N.D. Ill. Dec. 10, 2009) (quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. Cir. 2005)).

A party who is "aggrieved by the findings and decision" of the hearing officer has "the right to bring a civil action" in state court or a United States district court. 20 U.S.C. § 1415(i)(2).

In this case, Plaintiffs have moved for summary judgment. The Court's "standard of review in IDEA summary judgment cases differs from the norm." *M.B. ex rel. Berns v. Hamilton Southeastern Schools*, 668 F.3d 851, 859 (7th Cir. 2011). The IDEA requires the district court to (1) "receive the records of the administrative proceedings"; (2) "hear additional evidence at the request of a party"; and (3) basing its decision on a "preponderance of the evidence," "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The Court reviews the IHO's determination of legal issues *de novo*, but gives "due weight" to the IHO's factual determinations. *M.B. ex rel. Berns v. Hamilton Southeastern Schools*, 668 F.3d 851, 860 (7th Cir. 2011). While the Court is not to "substitute [its] own notions of sound educational policy for those of the [IHO]," *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1053 (7th Cir. 1997) (internal quotation marks and citation omitted), the level of deference given to the IHO's determination depends, in part, on whether the district court hears additional evidence that the IHO did not consider. In cases where the district court "reviews only that evidence that was before the administrative tribunal," the district court "owe[s] the administrative law judge's decision the usual deference that reviewing courts owe agencies when judicial review is limited to the administrative record." *School Dist. of Wisconsin Dells v. Z.S.*, 295 F.3d 671, 675 (7th 2002). "When no fresh evidence is taken, 'the fact that [the district judge] disagrees with the [administrative law judge or other administrative hearing] officer is not enough to justify setting aside the latter's order; he must be strongly convinced that the order is erroneous.'" *Id.* (quoting *Dale M. v. Bd. of Educ. of Bradley-Bourbonnais High School Dist. No. 307*, 237 F.3d 813, 815-16

(7th Cir. 2001)). "This is just another way of stating the clear-error or substantial-evidence standard." *Id.*

By contrast, where (as here) the district court "has before it evidence not considered at the administrative level," the court "will naturally defer less to the administrative decision, as it has an information advantage over the administrator that it lacks when judicial review is limited to the record that was before him." *Z.S.*, 295 F.3d at 675. In other words, "[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have." *Id.*; see also *Alex R. v. Forrestville Valley Community Unit School Dist. No. 221*, 375 F.3d 603, 612 (7th Cir. 2004) ("The more that the district court relies on new evidence, *** the less it should defer to the administrative decision[.]"). In addition, "[t]he amount of deference given to the IHO's decision is based in part on whether the IHO's findings were 'thorough and complete.'" *Kevin T. v. Elmhurst Community School Dist. No. 205*, 2002 WL 433061, at *3 (N.D. Ill. Mar. 20, 2002) (citing *Adams v. State of Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999)).

"Despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence." *Heather S.*, 125 F.3d at 1052 (citing 20 U.S.C. § 1415(e)(2)). "The party challenging the outcome of the state administrative decision bears the burden of proof." *Id.*; see also *Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005).

## III. Analysis

### A. Child Find

Plaintiffs contend that the IHO erred by ruling that there was insufficient evidence that CPS violated its Child Find obligation from June 18, 2014 to the time of the IHO's decision. According to Plaintiffs, the IHO's decision was based on the erroneous finding that the record

contained no evidence of Z.J.'s academic performance at Higgins during the fifth grade (the 2014-15 school year), when in fact the record contained Z.J.'s NWEA scores from Higgins for that school year. Plaintiffs also argue that the IHO improperly took into account L. C-W.'s testimony that, when Z.J. was having trouble with reading in third grade, L. C-W. decided to help Z.J. at home and "took no other action" despite the fact that L. C-W. "knew or should have known that [Z.J.] had a potential learning disability." [22-1] at 69.

The Court concludes that Plaintiffs have demonstrated by a preponderance of the evidence that CPS violated its Child Find obligation from March 2015 to the date of hearing by ignoring clear signs that Z.J. may have a learning disability. See *Demarcus L.*, 2014 WL 948883, at *5. The IHO's decision that CPS did not violate its Child Find obligation during this period was based in large part on her erroneous factual finding that the administrative record did not contain any test scores from Z.J.'s time at Higgins. Therefore, the Court gives less deference to the IHO's determination than it would if the IHO had evaluated the Higgins scores. See *Z.S.*, 295 F.3d at 675; *Kevin T.*, 2002 WL 433061, at *3. Those scores placed Z.J. in the 12th percentile in math in October 2014, the 15th percentile in math in February 2015, and the 14th percentile in math in June 2015. These scores are comparable to Z.J.'s scores from the 2015-16 and 2016-17 school years. According to CPS policy, a student must score at the 24th percentile or better to be promoted from sixth to seventh grade. Also according to CPS, NWEA scores are one of the two main indicia of a student's success, along with classroom grades. Given the importance that CPS places on these scores, the Court finds it more likely than not that a student who repeatedly scores well below the benchmark is displaying clear signs of a potential learning disability.

CPS claims that "the IHO's mistake in stating no standardized test scores from Higgins were produced does not undermine her final conclusion that no Child Find violation occurred,"

because "Plaintiffs produced no evidence, *other than the NWEA scores for the 2014-15 school year*, to indicate any clear signs that Z.J.'s learning disability was manifesting itself while she was attending Higgins." [38] at 10 (emphasis added). This argument, however, implicitly concedes that the low NWEA math scores from 2014-15 are "evidence [that indicates] clear signs [of] Z.J.'s learning disability" while at Higgins. *Id*. CPS also argues that the NWEA scores from fifth grade are not as important as the scores from sixth grade because "the testimony regarding the significance of scoring at the 24th percentile or better related to the promotion criteria to move from sixth to seventh grade, not what receiving a 12 to 15 percentile NWEA score means in fifth grade." [38] at 10. But this was not the basis for the IHO's decision. Instead, the IHO simply did not consider the NWEA scores from Higgins at all. Moreover, CPS offers no evidence that a low score should be considered a sign of a need to evaluate a student only in "benchmark" years. The Court is not convinced that a student must be on the verge of repeating a year before her low standardized test scores are taken seriously by CPS. There is "[n]o credible explanation" in the record for CPS's failure to monitor Z.J. while she was at Higgins, just like—as the IHO found— there was "[n]o credible explanation" for the failure of KNA's case manager to monitor Z.P. during the subsequent school years. [22-1] at 72.

The IHO also appears to have based her determination, in part, on the fact that there was no evidence that KNA *received* Z.J.'s 2014-15 test scores from Higgins. But it is the school district—not the individual school—that has the obligation to comply with the Child Find requirement. See 20 U.S.C. § 1412(a)(3)(A); 23 Ill. Adm. Code 226.100(a). The record shows that L. C-W. signed a form authorizing the transfer of Z.J.'s records from Higgins to KNA. See [22-1] at 12. This supports an inference that KNA either received or should have received Z.J.'s records. CPS's failure to properly transfer records does not absolve the district of its Child Find

obligation. Further, Illinois law governing due process hearings for children with disabilities provides that "[t]he *school district* shall present evidence that the special education needs of the child have been appropriately identified and that the special education program and related services proposed to meet the needs of the child are adequate, appropriate, and available." 105 ILCS 5/14-8.02a(g-55) (emphasis added). CPS does not dispute that its witness list for the due process hearing included Higgins' case manager, but that it did not call the case manager or anyone else from Higgins to testify about why Z.J. was not evaluated despite receiving a series of low scores on the NWEA math exam.

Finally, the Court agrees with L. C-W. that the IHO should not have based her decision to deny Plaintiffs' Child Find claim on the fact that L. C-W., a CPS psychologist, decided to help Z.J. with her reading at home after Z.J. was having trouble with reading in third grade, rather than having Z.J. evaluated for a disability. Under the IDEA, "[a] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint," 20 U.S.C. § 1415(f)(3)(C), unless the parent was "prevented from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required [by the IDEA] to be provided to the parent," *id.* § 1415(f)(3)(D). The IHO correctly stated that, pursuant to this provision, "[t]he due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint," unless one of the two statutory exceptions applies. [22-1] at 68. However, it appears that the IHO may have applied the statute of limitations to bar *any* Child Find violation claim, rather than limiting the claim to alleged violations that

occurred no more than two years before L. C-W. requested a due process hearing. See [22-1] at 69 ("[I]t it is clear Parent was aware Student was experiencing difficulties in reading as early as third grade, but chose to provide her own interventions rather than call Student's issue to the attention of CPS. This is 3 years prior to the date of the filing of this Complaint. *** After considering the Federal and State statutes, case law, witnesses testimony and other evidence, I find, by a preponderance of the evidence, that Parent knew or should have known that Student had a potential learning disability as soon as third grade, exercised self-help, and took no other action. By a preponderance of the evidence, I find there is no child find violation in this matter and Parents' claim fails."). To the extent that this is what the IHO intended to do, it was erroneous. See *D.K. v. Abington School Dist.*, 696 F.3d 233, 254 (3rd Cir. 2012) (holding that, where exceptions to IDEA's two-year statute of limitations did not apply, "Plaintiffs' claims [we]re limited to the two-year time period" before Plaintiffs requested a due process hearing). cf. *Avila v. Spokane School District 81*, 852 F.3d 936, 944 (9th Cir. 2017) ("[T]he IDEA's statute of limitations requires courts to apply the discovery rule without limiting redressability to the two-year period that precedes the date when 'the parent or agency knew or should have known about the alleged action that forms the basis of the complaint.'"). The Child Find claim that Plaintiffs asserted should be limited to the two-year period preceding L. C-W's request for a due process hearing.

Further, regardless of when L. C-W. suspected or should have suspected that Z.J. had a learning disability, CPS had an independent obligation under the IDEA to evaluate students when faced with evidence that they suffer from a suspected learning disability or other impairment. Neither the IHO nor CPS cite any authority suggesting that L. C-W's alleged knowledge of Z.J.'s learning difficulties absolved CPS of its responsibilities under the IDEA, and the authority that

Plaintiffs have brought to the Court's attention holds the opposite. See *Anchorage School Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012) ("educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents"); *Phyllene W. v. Huntsville City Bd. of Educ.*, 630 Fed. Appx. 917, 926 (11th Cir. 2015) (fact that parent "did not request an evaluation of her daughter's hearing *** did not absolve the Board of its independent responsibility to evaluate a student suspected of a disability, regardless of whether the parent seeks an evaluation" (citing 20 U.S.C. § 1414(b)(3)(B)).

For these reasons, the Court concludes that Plaintiffs have demonstrated by a preponderance of the evidence that CPS violated its Child Find obligation. However, Plaintiffs have not demonstrated that the Child Find violation began on June 18, 2014 (two years before Parent requested a due process hearing). The earliest NWEA math score in the record is from October 2014. It is questionable whether this single score should have put CPS on notice of the need to evaluate Z.J. But Z.J.'s February 2015 score was also substantially below the 24th percentile, and CPS still took no action to monitor Z.J.'s progress or evaluate her for special education services within a reasonable amount of time after receiving the February 2015 scores. The Court concludes, based on a preponderance of the record evidence, that CPS's Child Find violation began in March 2015—a month after Z.J. received her second low NWEA math score. At this point, CPS had two sets of low scores and sufficient time in which to initiate an evaluation of Z.J.

### B.  Compensatory Services

Plaintiffs also argue that the IHO erred by denying their request for compensatory services, which three of Plaintiffs' experts testified were necessary. According to Plaintiffs, the IHO determined (1) that ZJ was denied a FAPE only from March 2016 until April 2017; (2) that

Plaintiffs' experts' recommendations for compensatory services appeared to have assumed a denial of FAPE for a longer period of time; and (3) that the IHO therefore could not determine what compensatory services would be appropriate for one year period of FAPE denial. See [36] at 13. Plaintiffs argue that if the Court determines that the denial of FAPE period was longer than one year (as the IHO found) but shorter than three years (as Plaintiffs contend), then the Court should "remand this claim to an ISBE Hearing Officer to determine the appropriate level of compensatory services to restore lost educational opportunity caused by the denial of FAPE." [36] at 14.

CPS argues that Plaintiffs were properly denied compensatory services because, apart from their experts' reports, "Plaintiffs provided no documents or testimony supporting the recommendations, explaining how the experts calculated the amount of compensatory services recommended, or how the recommended services are reasonably calculated to provide educational benefits for Z.J. that accrued from special education services the Board should have provided." [38] at 12. Additionally, CPS contends that an award of compensatory services is unnecessary "in light of the fact that the IHO ordered Z.J. to be placed at Acacia or Cove which have extensive, intensive services." [38] at 13.

The Court concludes that this issue should be remanded to an ISBE hearing officer to determine what compensatory services, if any, are necessary to give ZJ the benefits that likely would have accrued had she been given a FAPE between March 2015 and April 2017. "Compensatory services are well-established as a remedy under the IDEA." *Jaccari J. v. Board of Educ. of City of Chicago, Dist. No. 299*, 690 F. Supp. 2d 687, 707 (N.D. Ill. 2010). The case law cited by Plaintiffs and located in the Court's independent research indicates that remand is appropriate where, as here, "the record does not supply the Court with enough information" to determine "how much compensatory education—if any—is necessary to restore [the student] to

the position she would have occupied, had [the school district] provided her with a FAPE during the periods in which she was deprived of one." *Petrina W. v. City of Chicago Public School Dist. 299*, 2009 WL 5066651, at *5 (N.D. Ill. Dec. 10, 2009); see also *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 153 (D.D.C. 2018) (remand to hearing officer was appropriate to determine parent's entitlement to compensatory relief, "because the hearing officer is better situated than th[e] Court to take additional evidence, to make further factual findings, and to evaluate [the student's] current educational needs in designing the appropriate relief"); *Butler v. District of Columbia*, 275 F. Supp. 3d 1, 5-6 (D.D.C. 2017) (remand from district court to hearing officer was warranted for hearing officer to take additional evidence regarding compensatory education award for school district's denial of FAPE, where only evidence came from parent's expert witness, who did not define student's present cognitive or behavioral disabilities or address what position student would have been in absent FAPE denial, nearly 18 months had passed since student last was in school, and nearly two years had passed since student's last comprehensive set of assessments); *Phillips ex rel. T.P. v. District of Columbia*, 736 F. Supp. 2d 240, 249 (D.D.C. 2010) (remand to hearing officer was necessary to allow parent additional opportunity to supplement record with evidence to support a compensatory award, even though parent failed to present evidence that would have allowed the hearing officer or district court to properly craft a compensatory award, where the hearing officer found that child was denied a FAPE and there was evidence in the record supporting a finding that child may have suffered a setback in his educational development as a result of that denial).

If the hearing officer determines that she needs "more information to make *** an individualized assessment" of Z.J.'s need for compensatory services, she should "allow the parties to submit additional evidence to enable h[er] to craft an appropriate compensatory education

award," and also "can order the assessments needed to make the compensatory education determination." *Butler*, 275 F. Supp. 3d at 5. Remand will also give the hearing officer an opportunity to consider CPS's argument that the education that Z.J. is receiving at Acacia or Cove already is providing her with the services needed to restore her to the position she would have occupied had FAPE not been denied.

### C. Vision Therapy

Finally, Plaintiffs argue that the IHO erroneously denied their request for vision therapy on the ground that "[n]o additional evidence" apart from Dr. Kim's testimony "was presented that visual therapy is necessary to allow the Student to benefit from her education." [36] at 14. Plaintiffs contend that they presented to the IHO substantial evidence that Z.J. has vision impairments that negatively affect her education and that can be remediated through vision therapy. In particular, Plaintiffs presented a report and testimony from Dr. Kim, who diagnosed Z.J. with myopia, bilateral myopia and a binocular vision disorder and recommended a full evaluation for visual efficiency skills and a minimum of 9 months of vision therapy. Dr. Kim explained at the hearing that Z.J.'s vision impairments had a negative impact on reading because Z.J. has difficulty tracking left to right with both eyes. Plaintiffs have also supplemented the record with Dr. Kim's full evaluation of Z.J.'s visual efficiency skills, which was issued on March 21, 2017 and not available at the due process hearing.

CPS argues that the IHO properly denied vision therapy because "Plaintiffs merely submitted expert reports containing recommendations with no other evidence supporting those recommendations" and because "the IHO highlighted that vision therapy is a 'hotly debated topic' with differing views." [38] at 14. CPS does not address the supplemental report that Plaintiff submitted, or object to the addition of the report to the administrative record.

The Court concludes that Plaintiffs have demonstrated by a preponderance of the evidence that Z.J. would benefit educationally by receiving vision therapy services to address her vision deficits. The IHO did not have Dr. Kim's supplemental report [18-1] to benefit her analysis, and therefore the IHO's opinion on this topic is entitled to less deference than it would otherwise receive. Dr. Kim diagnosed Z.J. with accommodative infacility, convergence insufficiency, and oculomotor dysfunction. Her report explains how accommodative infacility "will increase the effort when copying from one place to another, induce visual fatigue and avoidance of close work and result in reduced comprehension and retention of reading material," and her "visual focusing difficulty may/will make it more difficult for her to focus her attention and may contribute to behaviors that appear similar to Attention Deficit Disorder (ADD)." *Id*. at 5. Dr. Kim also explains that Z.J.'s convergence insufficiency causes Z.J. "to use excess effort to take in and process visual information," "reduce[s] her ability to sustain visual attention" and "accuracy on tasks requiring fine depth discrimination," and "negatively influence[s] [her] ability to make accurate spatial judgments, to determine where objects are in space in relationship to her and to each other, and to move through space surely and effectively." *Id*. Dr. Kim further explains that Z.J.'s oculomotor dysfunction results "in loss of place, skipping and omitting words when reading, and increased difficulty when copying from [a] whiteboard." *Id*. at 4. Dr. Kim recommends a specific course of vision therapy designed to give Z.J. "the opportunity to develop the necessary visual abilities for academic achievement." *Id*. at 10.

The IHO's opinion also does not acknowledge the reports and testimony of Plaintiffs' experts Mary Block and Dr. Rea concerning the need for vision therapy. Block "recommended vision therapy for Z.J." and stated that Z.J. "would benefit, educationally, by receiving vision therapy services to address her vision deficits," while Dr. Rea testified that the vision and ocular

motor difficulties that were identified by Dr. Kim, especially with regard to ocular motor kind of tracking, exacerbated Z.J.'s reading issues. See [39] at 14. CPS never questions or rebuts the reports and testimony of Plaintiffs' experts.

Furthermore, the Court agrees with Plaintiffs that the IHO placed undue weight on the contents of a website that the IHO located after the due process hearing, which opines that the efficacy of vision therapy is "hotly debated." Assuming it was proper for the IHO to consider the website at all—an issue that the Court need not decide—the Court fails to see how a generalized critique of the field of vision therapy, which was not part of the record at the due process hearing, should override the specific diagnoses and recommendations of Plaintiffs' experts—whose reports and testimony CPS never rebuts or even addresses. Even the web page cited by the IHO recognizes that "[s]ome eye doctors are strong advocates for vision therapy and testify to its benefits—especially for certain vision problems of children" and that "[m]any studies have shown that vision therapy can correct vision problems that interfere with efficient reading among schoolchildren." Gary Heiting, OD, All About Vision.com, "Vision Therapy for Children," https://www.allaboutvision.com/parents/vision_therapy.htm (last visited Sept. 26, 2018).

Therefore, the Court concludes that Z.J. is entitled to an award of weekly vision therapy for 36 weeks, as recommended by Dr. Kim. The Court further concludes that L. C-W should be reimbursed for the costs of the developmental vision assessment in the amount of $575.00, just as L. C-W. was reimbursed for the other evaluations that she obtained.

## IV. Conclusion

For these reasons, the Court grants Plaintiff's motion for summary judgment [34]. The Court finds that (1) CPS violated IDEA's "Child Find" obligation from March 2015 until April 2017 by failing to evaluate whether Z.J. may be eligible for special education and related services;

(2) Z.J. may be entitled to compensatory services designed to provide her with the educational benefits that likely would have accrued from special education services that CPS should have provided, but this issue should be addressed in the first instance by an ISBE hearing officer on remand; and (3) Z.J. is entitled to an award of weekly vision therapy for 36 weeks, as recommended by Plaintiffs' experts, and reimbursement for the costs of Dr. Kim's developmental vision assessment in the amount of $575.00. Parent shall provide CPS with a copy of the itemized bill and proof of payment or, if Dr. Kim has not been paid, a copy of the itemized bill and statement from Parent that the payment should be made directly to Dr. Kim. The District shall provide reimbursement/payment within 30 days of receipt of the itemized bill. This matter is remanded to an ISBE hearing officer to determine whether Z.J. is entitled to an award of compensatory services and, if so, what services are sufficient to provide Z.J. with the educational benefits that likely would have accrued from special education services that CPS should have provided. Plaintiffs' request for an award of reasonable attorneys' fees and costs remains pending. This case is set for status hearing on October 18, 2018 at 9:00 a.m.

Dated: September 26, 2018

_____
Robert M. Dow, Jr.
United States District Judge